637 F.2d 1101
 UNITED STATES of America, Plaintiff-Appellee,
Donny Brurell Buckley and Alycia Marquese Buckley, etc.,
Intervening Plaintiffs-Appellees,
v.
The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF
INDIANAPOLIS, INDIANA et al., Defendants-Appellants,
The Metropolitan School District of Perry Township, Marion
County, Indiana, et al., Added Defendants-Appellants.
 Nos. 78-1800, 78-1871, 78-1996 through 78-2006, 78-2039,
78-2221, 79-1831 through 79-1838, 79-1874 and 79-1875.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 25, 1979.
Decided April 25, 1980.
Certiorari Denied Oct. 6, 1980. See 101 S.Ct. 114, 115.
 
 Donald A. Schabel, Richard D. Wagner, Donald P. Bogard, Deputy Atty. Gen., William F. Harvey, Special Counsel to Atty. Gen., William M. Evans, Indianapolis, Ind., for defendants-appellants.
 John O. Moss, John Preston Ward, Indianapolis, Ind., Thomas I. Atkins, Boston, Mass., William L. Taylor, Center for Nat'l Policy Review, Catholic Univ. Law School, Washington, D.C., Richard J. Darko, Indianapolis, Ind., Mark L. Gross, Dept. of Justice, Washington, D.C., for intervening plaintiffs-appellees.
 Before FAIRCHILD, Chief Judge, and SWYGERT and TONE, Circuit Judges.
 FAIRCHILD, Chief Judge.
 
 
 1
 The Indianapolis School desegregation case is now entering its second decade.[1] It involves a municipality, the (present) City of Indianapolis, which contains within its borders more than a half dozen separate and autonomous school districts. Eight years ago the district court determined that the fourteenth amendment violations committed by the largest of those districts (the Indianapolis Public Schools-IPS) and the State of Indiana could be remedied only by a desegregation plan which would transfer students from IPS to the predominately white school districts which surround it.[2] After an appeal and a remand to the district court for further consideration,[3] we affirmed, finding that the standard for interdistrict relief established by Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) were met in this case, at least with regard to those districts within the (present) City of Indianapolis.[4] The Supreme Court vacated and remanded for further consideration in light of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[5] On reconsideration we reaffirmed our holding that certain acts of the State of Indiana, particularly in connection with the "Uni-Gov" legislation which created the new city boundaries, had interdistrict effect, but remanded the case to the district court for findings of intent in light of the cases mentioned by the Supreme Court and evaluation of other issues, particularly regarding the location of public housing projects, in light of Milliken, Arlington Heights, and Dayton Board of Education v. Brinkman (I) (433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)).[6]
 
 
 2
 In his most recent opinions, which are the ones now before us, the district court judge found that the exclusion of schools from the Uni-Gov legislative scheme was done with a racially discriminatory purpose. He found a similar racially discriminatory purpose in the failure of the Housing Authority of the City of Indianapolis (HACI) to build any units outside of the old central city of Indianapolis despite legislative authority to do so. He also held that certain legislation[7] enacted by the Indiana legislature in response to his earlier decisions in the case allowed him to implement an interdistrict remedy without regard to the legislative intent questions posed by the Supreme Court and by our decision. He rejected, however, attempts by the IPS to establish that intradistrict violations by IPS had a segregative impact on housing patterns and school enrollment patterns throughout the city. He also denied requests by the United States and IPS to allow immediate implementation of an intradistrict remedy. On the issue of remedy he reaffirmed his earlier determination that the appropriate remedy is a student reassignment plan which would transfer black students from IPS to the other districts within the city until each of the surrounding districts is approximately 15% black and then reassign the remaining IPS students within IPS to achieve complete desegregation within the IPS boundaries. He also ordered that certain in-service training programs be implemented, with the cost to be borne by the State of Indiana, and made permanent his injunction against any expansion of public housing (except for the elderly) within the boundaries of IPS.
 
 
 3
 Although virtually all of these decisions are challenged by one or more of the parties to these appeals, the central issue remains the propriety of a desegregation plan that extends to those parts of the City of Indianapolis which are in separate and independent school districts outside the boundaries of the Indianapolis Public Schools. We will address that issue in Part I of the opinion, discussing in turn the evidence regarding Uni-Gov, housing, and the interdistrict effects of segregation within IPS. In Part II we will turn to the other issues raised by the various appellants.
 
 
 4
 * As we noted in our last opinion (573 F.2d 400), an interdistrict remedy such as that ordered by the district court must be predicated on a finding that official action, taken with a discriminatory purpose, was a substantial cause of interdistrict segregation. Milliken v. Bradley, 418 U.S. 717, 744-45, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The plaintiffs here pursued two independent avenues of proof in their attempt to make the requisite showings. The first centered around the exclusion of the Indianapolis Public Schools from the 1969 legislation which for most other purposes created a single metropolitan form of government for Marion County. The second concerned the governmental decision to locate all public housing projects within the old city of Indianapolis (and thus within the borders of IPS). In addition, IPS attempted to prove that de jure segregation of the IPS schools was in part responsible for the segregated housing patterns found throughout the county. The district court found that only the Uni-Gov and housing evidence supported an interdistrict remedy, rejecting as not credible the expert witnesses called by IPS in its attempt to establish the third point.
 
 UNI-GOV
 
 5
 In our last opinion we held that the exclusion of schools from the Uni-Gov legislation passed in 1969
 
 
 6
 "meets the requirements of Milliken and therefore can be used as a basis for imposing an interdistrict remedy if the district court finds that the General Assembly, in enacting the series of legislation, acted with a discriminatory intent or purpose."
 
 
 7
 573 F.2d 400, 408.
 
 
 8
 The district court has now found that the actions of the General Assembly "were done, at least in part, with the racially discriminatory intent and purpose of confining black students in the IPS school system to the 1969 boundaries of that system, thereby perpetuating the segregated white schools in suburban Marion County." 456 F.Supp. 183. The appellants vigorously assert that there is no support in the record for that finding, disputing not so much the evidence itself, but rather whether taken as a whole, it supports the district court's conclusion.
 
 
 9
 In its remand for consideration of the discriminatory purpose question, the Supreme Court referred us to Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1967) and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Washington v. Davis sets forth the intent requirement, but says little about how it is to be met, apart from noting that
 
 
 10
 "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than on another. . . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."
 
 
 11
 426 U.S. 229, 242, 96 S.Ct. 2040, 2048-2049, 48 L.Ed.2d 597.
 
 
 12
 Justice Stevens, concurring, notes that the degree and type of proof needed to establish intent may vary considerably from one sort of case to another, and that
 
 
 13
 "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process."
 
 
 14
 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597.
 
 
 15
 The Arlington Heights decision provides considerably more guidance. That decision calls for "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and then suggests as possible lines of inquiry, in addition to discriminatory impact, "the historical background of the decision," "the specific sequence of events leading up to the challenged decision," "departures from the normal procedural sequence," "substantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "legislative or administrative history." 429 U.S. 252, 266-268, 97 S.Ct. 555, 564-565, 50 L.Ed.2d 450. With these guidelines in mind, we turn to the evidence on which the district court rested its decision.
 
 
 16
 Indianapolis and Marion County, before Uni-Gov, were not unlike dozens of other metropolitan areas throughout the country. The central city, Indianapolis, was losing population and becoming more predominately black and poor while the surrounding suburban areas were growing rapidly, but, with a few exceptions, remaining almost exclusively white. School enrollments were following a similar pattern. By 1970 IPS enrolled less than 60% of the county's total students, but over 97% of the black students in the county. These demographic facts of life, of course, can no more support a metropolitan desegregation plan here than could a similar pattern in Detroit (the focus of Milliken v. Bradley ) or any other major city. They form an important backdrop, however, for the historical events, which are of somewhat more significance to this case.
 
 
 17
 As the district court noted, Indiana has had a long history of both public and private discrimination against its black citizens. This history has been described at length in earlier opinions and will not be repeated here, but ranged from state legislation which affirmatively sanctioned the de jure segregation of the Indianapolis Public Schools until 1949 to numerous instances of private housing discrimination, some of which were still being openly practiced past the date suit was filed. Other official acts of discrimination included a prohibition on marriage across racial lines, not repealed until 1965; a requirement that only white males could serve in the militia, finally repealed in 1936; and a policy enforced until after World War II that blacks could enter state parks only on a segregated basis. The state was also implicated in the deliberate policies of segregation practiced by IPS, particularly with regard to its role in selection of sites for new schools.[8] These historical facts are not conclusive, of course, but may properly be considered by the court in its attempt to determine whether there was a discriminatory intent in the legislature's failure to include schools in the Uni-Gov consolidation.
 
 
 18
 Of greater relevance, however, is the history of school district expansion and consolidation in Indiana. As we have said in prior decisions,[9] Indiana has for generations pursued a legislative policy that school district lines should grow as the corporate lines of their cities grow. That policy was recognized by the Indiana courts as early as 1867[10] and was subsequently made explicit by legislation.[11] The policy was modified in 1959 to allow greater consolidation among Indiana's many small school districts[12] but was reaffirmed as to the Indianapolis district in particular by legislation enacted in 1961.[13] Although the legislation did not always achieve its stated purpose the policy it expressed was clear and although there was seldom a perfect correspondence between civil city and school boundaries the exceptions were generally in favor of larger, rather than smaller, school districts.
 
 
 19
 It was against this backdrop that the Uni-Gov legislation was enacted in 1969. Civil, as well as school, annexations had become all but impossible to achieve because of opposition from the suburban areas which would be affected. Richard Lugar, then the Mayor of Indianapolis, along with other governmental and business leaders, was convinced that a county-wide governmental structure would be in the best interests of greater Indianapolis and conceived of Uni-Gov as a way of "sidestepping" the problems of direct annexation. The Uni-Gov legislation, officially entitled the "Consolidated First-Class Cities and Counties Act" included all of Marion County in a new governmental unit called the City of Indianapolis. All residents of the new city now vote in elections for mayor and members of the City-County Council. The new council has taken over most of the functions of county government (and of numerous special service districts) as well as the functions of the Common Council of the old City of Indianapolis. Some governmental units remain unchanged however. The airport authority, building authority, county courts, and hospital authority remain separately governed. There are special provisions for police and fire districts. In addition, the "excluded cities" of Beech Grove, Speedway, and Lawrence retain their own local governments and provide their own municipal services. Nonetheless the City-County Council has authority over building code enforcement, municipal planning, thoroughfare control and air pollution regulation even in the "excluded cities" and the residents of those cities vote in Uni-Gov elections.
 
 
 20
 Under the 1961 Act, if the Uni-Gov legislation could be characterized as an extension of Indianapolis' civil city boundaries by civil annexation, it would have followed that the boundaries of IPS would have expanded to cover the area included in the new City of Indianapolis. Section 1(e) of the 1961 Act defines "civil annexation" as "any action whereby the civil boundaries of any civil city are extended." The Uni-Gov Act in turn defined the new boundaries of the "City of Indianapolis" as "all of the territory of a First Class City and of the County, except for the territory located in Excluded Cities." Indiana Acts 1969, Ch. 173, § 102(f). Nevertheless the appellants argue vigorously that the Uni-Gov legislation was not such an annexation as defined by the 1961 Act and that therefore it is inappropriate to read any racially discriminatory intent into its limited scope. What convinces us that such a reading may be appropriate is the fact that the state legislature was sufficiently concerned about the possible expansion of IPS that might, under the 1961 Act, follow the enactment of the Uni-Gov legislation that it passed a special bill, just sixteen days before final passage of the Uni-Gov legislation, to repeal the applicable portions of the 1961 Act. As we have noted before, the repeal of section 9 of the 1961 Act appears to have been done in direct response to concerns that otherwise the boundaries of IPS would expand with the borders of the new City of Indianapolis. 573 F.2d 400, 407 (7th Cir. 1978). We do not think that the Indiana legislature thought it was engaged in a futile act or that the repeal was unrelated to the Uni-Gov legislation then pending. As Mayor Lugar testified, the Uni-Gov legislation would not have passed if it would have meant that city and suburban school districts would be consolidated. Given the starkly segregated conditions then existing in Marion County it is also clear, as it must have been then, that the likely result of that special legislation would be a continuation of the racial disparity then existing between IPS and other school districts in Marion County.
 
 
 21
 The appellants nonetheless assert that there were valid, non-racial reasons for the repeal of the 1961 Act. They point particularly to evidence that both the Marion County School Reorganization Committee in 1961, and IPS in 1967, had recommended that county-wide school consolidation not be pursued. Mayor Lugar testified that these recent rejections of a county-wide system were the reason that there was never any consideration of including schools in the Uni-Gov scheme, even though he personally thought, and argued, that it would be wise to have at least a county-wide common school tax. The opposition of IPS was apparently based largely on a determination that the district was better off financially with the students and tax base it already had than with the expanded tax base, but even more expanded long-term capital obligations, that would accompany consolidation. The reasons for the opposition of the Reorganization Committee are far less clear. The Committee originally supported a county-wide district and retreated from that position only when strong public opposition to consolidation was encountered. As the district court noted, however, the suburban districts throughout this period were engaged in a variety of cooperative ventures with each other, but never with IPS.
 
 
 22
 What this adds up to, we think, is the obvious conclusion that opinions about the merits of consolidation differed. On one hand there was the long-established, and recently reaffirmed, legislative determination that school boundaries, particularly in Marion County, should expand with civil city boundaries. On the other hand, there were those who felt that the students of Marion County were best served by smaller units of school government. The question is not whether one of these positions was racially invidious and the other not; the question is rather whether the legislative decision in 1969 to abandon its past policy in favor of the position advocated by the opponents of consolidation was done with a racially discriminatory purpose. The district judge considered the timing of the decision (shortly after this suit had been filed, signaling a likely end to the segregated conditions which had been prevailing within IPS), the history of state sanctioned discrimination against black students within IPS, the foreseeable impact of the decision on the minority population of Indianapolis, and the predominately political, rather than educational, reasons for the decision and concluded that it was made with a discriminatory purpose.[14] We do not think any of those factors was improperly considered under Washington v. Davis or Arlington Heights, nor do we believe that the conclusion of discriminatory purpose was clearly erroneous in light of evidence of record. We therefore affirm the district court's determination that the 1969 repeal of the 1961 Act was done with a discriminatory purpose. We will discuss at a later point whether this finding supports the specific remedy ordered by the district court.
 
 THE HOUSING VIOLATIONS
 
 23
 In his concurring decision in Milliken v. Bradley, Justice Stewart explained
 
 
 24
 "This is not to say, however, that an interdistrict remedy of the sort approved by the Court of Appeals would not be proper, or even necessary, in other factual situations. Were it to be shown, for example, that state officials had contributed to the separation of the races . . . by purposeful racially discriminatory use of state housing or zoning laws, then a decree calling for transfer of pupils across district lines . . . might well be appropriate.
 
 
 25
 418 U.S. 717, 755, 94 S.Ct. 3112, 3132, 41 L.Ed.2d 1069.
 
 
 26
 With specific reference to the facts before the Court in Milliken he noted that "(n)o record has been made in this case showing that the racial composition of the Detroit school population or that residential patterns within Detroit and in the surrounding areas were in any significant measure caused by governmental activity . . . ." 418 U.S. 717, 756, 94 S.Ct. 3112, 3133 n.2, 41 L.Ed.2d 1069. In our most recent remand opinion, we instructed the district court as follows:(A)n interdistrict desegregation remedy is appropriate if the following circumstances are shown to exist (given the fact that there is a vast racial disparity between IPS and the surrounding school districts within the "new" City of Indianapolis): (1) that discriminatory practices have caused segregative residential housing patterns and population shifts; (2) that state action, at whatever level, by either direct or indirect action, initiated, supported, or contributed to these practices and the resulting housing patterns and population shifts; and (3) that although the state action need not be the sole cause of these effects, it must have had a significant rather than a de minimis effect. Finally, an interdistrict remedy may be appropriate even though the state discriminatory housing practices have ceased if it is shown that prior discriminatory practices have a continuing segregative effect on housing patterns (and, in turn, on school attendance patterns) within the Indianapolis metropolitan area.
 
 
 27
 The record shows that the district court already has received evidence and has made certain findings in the area of housing discrimination. See Indianapolis I, 338 F.Supp. at 1204-05; Indianapolis IV, 419 F.Supp. at 183-85. It is important, however, that on remand the district court specify what state-responsible housing practices of a discriminatory nature, if any, have resulted, at least in part, in segregative residential patterns. This is necessary not only to determine initially whether an interdistrict remedy is appropriate, but also to fashion an appropriate remedy.
 
 
 28
 573 F.2d 400, 409-10.
 
 
 29
 In addition, we made it clear that the intent requirement applied here as well, i.e., that the "official actions" must have been taken with a discriminatory purpose.
 
 
 30
 On remand, the district court, with one exception, did not attempt to determine how much, if any, of the current housing segregation within the new City of Indianapolis was caused by intentional state action rather than by non-discriminatory actions or by private acts of discrimination. In the absence of such findings, the history of past state involvement in housing segregation, detailed at 332 F.Supp. 655, 662-3, could not support the interdistrict remedy ordered by the court.[15] The question is narrowed therefore, to the one exception, which is the location of public housing within Marion County.
 
 
 31
 The Housing Authority of the City of Indianapolis (HACI) and the Metropolitan Development Commission of Marion County (Commission) have, since 1964, been responsible for the placement of public housing in much of Marion County. Under Indiana law in effect at the time, HACI's "area of operation" included all of the old City of Indianapolis as well as "the area within (5) miles of the territorial boundaries thereof." IC 1971 18-7-11-3. Of the eleven public housing projects in Marion County ten were built, mostly in the late 1960's, on sites selected by HACI and approved by the Commission.[16] Each of the eleven projects is within IPS. Those which house families are approximately 98% black.
 
 
 32
 It was obvious to the district court that the choice of location of those projects had an impact on school enrollments by keeping black students within IPS and out of the surrounding school districts. In our remand order we held that this presumably segregative impact could support an interdistrict school desegregation order only if a) the decision to locate public housing within IPS was the result of a discriminatory purpose, either on the part of HACI or on the part of surrounding governmental units which may have resisted the placement of public housing in their communities, and, b) those decisions had a "substantial" interdistrict effect. 573 F.2d 400, 410, 413-4. The district court has now made both of these findings. The question on appeal is whether the evidence supports the findings. We will discuss the intent findings now and the question of "substantial interdistrict effect" at a later point in the opinion.
 
 The district court found as follows:
 
 33
 "The action of . . . official bodies in locating such projects within IPS, as well as the opposition of the suburban governments to the location of public housing within their borders, (was) racially motivated with the invidious purpose to keep blacks within pre-Uni-Gov Indianapolis and IPS, and to keep the territory of the added suburban defendants segregated for the use of whites only."
 
 
 34
 456 F.Supp. 183, 189.
 
 
 35
 These findings were based on the history of racial discrimination, both public and private, in housing in Marion County; on the natural and foreseeable results of the site selection practices; on the absence of convincing non-racial justifications for HACI's failure to locate projects outside of IPS; and on other actions by the Commission, not directly related to housing, which led the court to conclude that "the separation of the races, both in housing and in schools, has been an unspoken, but intentional policy of the Commission." 456 F.Supp. 189.[17]
 
 
 36
 The district court's findings have ample support in the record. At least five of the ten housing projects built during the 60's were located on or just a few blocks within the IPS-suburban boundary. Others are close-by. All, however, are within IPS. One project was built just across the street from Warren township (then 98% white). Another was located on land that was once a part of Wayne township (then 99% white), but was annexed by the old city, at HACI's request, over the objections of the IPS Superintendent that existing school facilities were inadequate to serve the project. The judge considered the reasons offered by HACI to explain this striking pattern and found none of them convincing. He also noted that the Commission, which selected or approved all the sites, had already been implicated in the de jure segregation of Crispus Attucks High School (for decades the official high school for black students within IPS) by its refusal to allow IPS to use land in a white neighborhood for a new Attucks High School.[18]
 
 
 37
 HACI and the suburban defendants have argued here, as they did in the court below, that public housing could not have been built outside the limits of IPS absent a "cooperation agreement" with the appropriate suburban government. The Federal Housing Act which provided the funds for the HACI projects did, at that time, require a cooperation agreement with "the locality involved."[19] The district court found the federal statute irrelevant, holding that the "locality involved" was the governmental authority which had chartered the housing authority, here the (old) City of Indianapolis. We agree that in this case the cooperation agreement requirement is irrelevant, but for a somewhat different reason.
 
 
 38
 It was HACI's position at trial that it could not build public housing outside the old city of Indianapolis, despite its statutory authority to do so, without additional cooperation agreements. The evidence at trial, however, disclosed no serious attempts by HACI to obtain those cooperation agreements. Instead it showed that HACI never considered placing traditional public housing outside of the old city limits. The Deputy Mayor of Indianapolis, who had been a planner for the Metropolitan Planning Department when sites were selected and who had recommended sites to a task force charged with site selection, testified that the criteria used "automatically excluded looking outside the corporate limits of the (old) City of Indianapolis." But the trial judge, who heard the witnesses, found the "criteria" defense not credible and concluded, on the evidence before him, that the only reason sites outside of old Indianapolis were not considered was because the responsible agencies were pursuing a deliberate policy of racial segregation. On these facts, then, it makes no difference whether or not additional cooperation agreements may have been required. It was HACI's own decision to limit the projects to IPS that decision was not forced on it by the refusal of some other governing body to enter into a cooperation agreement.
 
 
 39
 We therefore affirm the district court's finding that the decision in the '60's to locate all public housing in Marion County within the boundaries of IPS was the result of a segregative intent by the responsible state agencies. We will discuss at a later point in the opinion the appellants' contention that the placement of all public housing within IPS did not have a "substantial" interdistrict effect.
 
 
 40
 INTERDISTRICT EFFECTS OF INTRADISTRICT SEGREGATION
 
 
 41
 In an effort to support a remedy that would extend beyond its own boundaries, IPS presented expert testimony in an attempt to establish that the de jure segregation of the schools within the old City of Indianapolis, as found by the district court in an earlier decision (332 F.Supp. 655) and affirmed by us (474 F.2d 81, cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973)), had resulted in segregated housing and/or school enrollment patterns throughout the metropolitan area.[20] In offering that proof IPS was relying on Chief Justice Burger's statement in Milliken v. Bradley that
 
 
 42
 "Before the boundaries of separate and autonomous school districts may be set aside . . . it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district.
 
 
 43
 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974).
 
 
 44
 The essence of the expert's testimony was that the acts of de jure segregation practiced within IPS identified certain geographic areas of Marion County (all within IPS) as "black" areas and that correspondingly other areas beyond, as well as within, the limits of the school district became identified as "white" areas. Private housing choices then followed these quasi-official neighborhood designations. Since all of the "black areas" were within IPS that necessarily meant that a disproportionate number of the "white" areas were in the outlying school districts. Since school enrollment patterns so closely reflect residential population patterns, it could then be said that the predominately white school enrollments of the outlying districts were caused in significant part by the intentional acts of segregation practiced within IPS.
 
 
 45
 The expert's theory is not implausible. The district judge, however, after hearing the testimony, rejected it as not credible, citing both the general nature of much of the testimony and the weakness of statistical support for the conclusions regarding Marion County. No. IP-C-225 (S.D.Ind. April 24, 1979). On review of the record, we cannot say that the district court's rejection of the expert's testimony was improper. We therefore do not disturb the finding that the effects of school segregation within IPS cannot support the city-wide desegregation plan ordered by the district court.
 
 THE INDIANA TRANSFER STATUTE
 
 46
 The district court also relied on an Indiana statute, IC 1971 20-8.1-6.5, as a basis for the city-wide remedy.[21] This statute was enacted by the Indiana legislature in 1974 in response to an earlier order of the district court in this case.[22] It is entitled "Regulations Regarding Transfers of Pupils by School Corporations Pursuant to Court Order" and, by its terms, applies "solely" to situations where a state or federal court has found (and all appeals have been exhausted) that
 
 
 47
 "(a) a transferor corporation has violated the equal protection clause of the fourteenth amendment to the Constitution of the United States by practicing de jure racial segregation of the students within its borders;
 
 
 48
 "(b) a unitary school system within the meaning of such amendment cannot be implemented within the boundaries of the transferor corporation; and
 
 
 49
 "(c) the fourteenth amendment compels the court to order a transferor corporation to transfer its students for education to one or more transferee corporations to effect a plan of desegregation . . . which is acceptable within the meaning of such amendment."
 
 
 50
 In relying on this statute as an independent source of authority for its city-wide transfer plan, the district court judge held that these three conditions had all been established. 456 F.Supp. 183, 191.
 
 
 51
 Regardless of whether or not these conditions had been established in this case, however, it is clear from the face of the statute that it is procedural only designed to provide a mechanism for student transfers in cases where those transfers are ordered to remedy fourteenth amendment violations. It is not an independent source of authority to require student transfers and cannot, standing alone, be the basis for a desegregation order. The statute becomes applicable to this case only because we affirm the district court's finding that there were intentional state acts which had a significant impact across district lines.
 
 THE SCOPE OF THE REMEDY
 
 52
 Having concluded that only the Uni-Gov and housing violations meet the tests of Milliken and Arlington Heights, we must next consider whether those constitutional violations are appropriately remedied by the specific desegregation plan ordered by the district court.
 
 
 53
 The district court's plan calls for the transfer of slightly more than six thousand IPS students to eight other school districts within the city. The students remaining in the IPS schools would then be reassigned within IPS, under a plan not yet specified, to the extent necessary to eliminate racially identifiable schools. The various non-IPS defendants, relying primarily on Dayton Board of Education v. Brinkman (I), 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), assert that this plan goes too far. The IPS noting that the plan does not call for the reassignment of any non-IPS students to IPS schools, asserts that it does not go far enough. We will address each of these contentions in turn.
 
 
 54
 Our most recent opinion remanding this case to the district court was written shortly after the Supreme Court had issued its first decision in Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) ("Dayton I"). In that case Justice Rehnquist spoke of the duty of the district court to "determine how much incremental segregative effect" specific constitutional violations had on the racial distribution of pupils "when that distribution is compared to what it would have been in the absence of such constitutional violations" and to design a remedy "to redress that difference." 433 U.S. 406, 420, 97 S.Ct. 2766, 2775. Therefore, although we observed that the district court had apparently kept in mind the principle that a remedy must be tailored to fit the nature of the violation, we urged the court on remand to "explicitly" consider it. 573 F.2d 400, 415.
 
 
 55
 Judge Dillin attempted to determine a precise number of children who would have received a desegregated education "but for" the failure of HACI to build public housing in the area outside IPS. 456 F.Supp. 183, 196. With respect to Uni-Gov, however, he concluded that it would be impossible to determine the incremental effect of the legislation since Uni-Gov would not have been passed if the schools had not been excluded from its scope. We will address the Uni-Gov questions first.
 
 
 56
 The difficulties in attributing specific incremental effects to the Uni-Gov violation do not mean that that violation cannot support an interdistrict remedy. In more recent cases the Supreme Court has described as a "misunderstanding" of Dayton I the view that a party must prove "with respect to each individual act of discrimination precisely what effect it has had on current patterns of segregation" (Dayton Board of Education v. Brinkman (II), 443 U.S. 526, 99 S.Ct. 2971, 2981, 61 L.Ed.2d 720 (1979). The Court has quoted with approval the Sixth Circuit's holding that "policies of systemwide application necessarily have systemwide impact." (Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 2951, 61 L.Ed.2d 666 (1979), quoting Penick v. Columbus Board of Education, 583 F.2d 787, 814 (6th Cir. 1978)), and has reaffirmed the basic rule that "the remedy imposed by a court of equity should be commensurate with the violation ascertained." Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666.
 
 
 57
 It is now clear, if it was ever in doubt, that the "incremental effects" test applies only to cases where discrete isolated examples of discrimination are established. Proof of systemwide discrimination, in contrast, still calls for a systemwide remedy. It is the latter that we have here. The decision to prevent IPS from expanding with the City of Indianapolis was a decision affecting the city as a whole, not just certain schools or certain school districts within the city.[23] We do not have a situation such as that presented in Denver, or Dayton, or Columbus, where the discriminatory actions took place one at a time, often affecting just one school at a time, and the courts had to determine whether, taken together, they permitted an inference of discriminatory intent as to the district as a whole. Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); Dayton Board of Education v. Brinkman (II), 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).[24]
 
 
 58
 Nor is it relevant that without the companion legislation freezing IPS boundaries Uni-Gov never would have been enacted. Once the state chose to act it was obligated to do so in a non-discriminatory manner. Evans v. Buchanan, 393 F.Supp. 428, 443 (D.Del.) aff'd 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). Our case fits squarely within the rule of Milliken that "where district lines have been deliberately drawn on the basis of race . . . an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation." 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069. We reject therefore the claim of those appellants who assert that the remedy ordered by the court went too far.
 
 
 59
 A remedy must still be tailored to fit the violation and an interdistrict remedy must still attempt to respect local autonomy and local political processes. Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). Here the district court ordered the implementation of a transfer plan which would preserve the independence of the individual school districts while still attempting to remedy the violation found. It has been suggested that this is not the remedy most closely tailored to the violation. We tend to agree. The most closely tailored remedy would likely be one that would allow IPS to expand to the city borders. Confronted with a nearly identical violation, that was the remedy ordered by a three judge district court in Delaware. Evans v. Buchanan, 416 F.Supp. 328 (D.Del.) aff'd 555 F.2d 373 (3rd Cir.) (en banc ), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977); see also, Morrilton School District No. 32 v. U. S. A., 606 F.2d 222, 229 (8th Cir. 1979) (en banc ). Such a remedy might well have been appropriate here. It also, however, would have been far more intrusive into local political processes. Under the circumstances we cannot say that the trial judge violated his obligation to weigh these competing considerations or abused his discretion in developing a remedy.
 
 
 60
 The transfer plan is also an appropriate remedy for HACI's decision, for racially discriminatory purposes, to place all public housing projects within IPS. The connection between that policy and suburban housing and school enrollment patterns is obvious. It, like the Uni-Gov violation was not limited to a single school or even to a single school district. It was a general policy which affected housing and school patterns throughout HACI's area of operation. Ten public housing projects, with units for over 1600 families, were built by HACI pursuant to this policy. In addition, as the court found, once a public housing project was opened other blacks tended to settle in the area around the project, thus multiplying the effect which the project had already had on the racial composition of neighborhood schools. While appellants may be correct in their claim that the judge miscalculated the exact number of students affected by the violation, we cannot agree that the number of students affected is so small that the violation can be said to be insignificant. We do note, however, that if this were the only constitutional violation present in this case, an appropriate remedy on this record would have to be limited to the territory within HACI's area of operation at the time the projects were built.
 
 
 61
 There are, nevertheless, two aspects of the transfer plan that require further discussion. The first is the "one-way" remedy ordered by the district court. Under this plan black students from IPS are to be transferred from IPS to other districts in the city but no students from other districts are to be transferred to IPS. Many white students within IPS will be reassigned to other schools within the district, however, so that it cannot be said that only minority students will bear the burden of the remedy imposed by the court. The court also considered the generally better facilities available in the outer districts as compared to IPS and the fact that reducing the student population of IPS would allow that district to close some obsolete schools. Therefore, despite our concerns about the possible inequities of the plan, we are not prepared to say that it was such a clear abuse of discretion that it must be set aside in favor of a two-way plan.
 
 
 62
 We do note, however, that among the reasons the court listed for rejecting a two-way plan suggested by IPS was the court's conclusion that it had "no power to order a suburban child be transported out of its own school corporation so long as the suburban school corporations remain as separate legal entities, because there is no evidence that any of them has operated anything other than a unitary school system." (No. IP 68-C-225 S.D.Ind. Memorandum Decision at 17, April 24, 1979). In so holding, the district court was in error. There is no distinction that can be made between the court's power to order districts to accept transfer students from IPS and its power to order students from those districts to transfer to IPS schools. In both cases the power depends not on the culpability, or lack thereof, of the suburban districts involved but rather on the finding that discriminatory actions by the state had a significant segregative impact across district lines. The court does, then, have the power to implement a plan which would reassign students from non-IPS districts to IPS schools. We will not vacate the plan as ordered but will instruct the district court that it does have this power and should feel free to use it if modifications of the plan become necessary.
 
 
 63
 There is one other matter that requires further consideration by the district court. The school town of Speedway and the school city of Beech Grove both assert that their peculiar status under both Uni-Gov and the state law from which HACI draws its authority make it inappropriate to include them in a city-wide remedial plan, regardless of whether or not such a plan is otherwise appropriate. Without finally determining the merits of those claims, we think they are substantial enough to require separate consideration by the district court.
 
 
 64
 The special status of the cities of Speedway and Beech Grove under the Uni-Gov Act is not in dispute. The Act defines them as "excluded cities" and they are technically not a part of the "new" City of Indianapolis. IC 18-4-1-2(f). Nevertheless, as we have noted previously, the consolidated government was given "significant powers even in the excluded cities." 541 F.2d 1216. The hybrid status of the communities is reflected in their political structures: each community has its own elected government but the residents of each also vote in Uni-Gov elections. See Dortch v. Lugar, 255 Ind. 545, 266 N.E.2d 25 (1971). In each case the school district's boundaries are coterminous with the civil boundaries. The appellants make a strong showing that Indiana law prior to Uni-Gov, despite its policy in favor of school district expansion following civil expansion, would not have permitted IPS expansion into Speedway and Beech Grove. The two cities therefore assert that since their schools were unaffected by the violation a remedy which includes them goes beyond the violation shown.
 
 
 65
 We think the issue is not quite as simple as Speedway and Beech Grove present it. As they present the argument, unilateral civil annexation of Speedway and Beech Grove by Indianapolis was prohibited by Indiana law. Therefore, the City of Indianapolis could not expand into their communities. Therefore, even if it was state policy to allow school boundaries to expand with civil boundaries, the barrier to unilateral civil annexation would have prevented IPS from ever expanding into their communities.
 
 
 66
 But despite all the barriers to annexation established generally by Indiana law prior to Uni-Gov, the Uni-Gov legislation did allow the City of Indianapolis to expand to the borders of Marion County. And specifically Speedway and Beech Grove, despite their protected status under pre-Uni-Gov annexation law and despite their categorization "as excluded cities" under Uni-Gov, nonetheless became subject to the authority of the Uni-Gov government for many purposes.[25]
 
 
 67
 The question then is not whether Indiana law prior to Uni-Gov would have permitted the expansion of IPS into Speedway and Beech Grove but rather whether, if the Uni-Gov legislation had not generally excluded schools, it would have nonetheless excluded the schools of Speedway and Beech Grove.
 
 
 68
 It also appears likely that HACI's area of operation did not include the City of Beech Grove and may not have included the Town of Speedway as well. Prior to 1969, the area of operation of a city housing authority was defined so as to exclude "any area which lies within the territorial boundaries of some other city as herein defined." "City," in turn, was defined in the Act as "any city." Indiana Acts, 1937, Ch. 207, Sec. 3. Beech Grove was, and is, incorporated as a city under Indiana law. Speedway was a town. The 1969 amendments to the Act expanded on this, stating that a city housing authority's area of operation would not include "another city or town (or) the area of operation of the housing authority of another city or town." IC 18-7-11-3(g). This raises several questions. The most obvious is whether HACI's pre-1969 area of authority may have included the Town of Speedway but not the City of Beech Grove. While the two communities appear to be similarly situated with respect to Uni-Gov they may be in different positions with respect to HACI. In either case, however, the requirement that a remedy be tailored to fit the violation means that their inclusion in the district court transfer plan may be inappropriate.
 
 
 69
 These substantial questions have not been fully briefed. Nor have they been addressed by the district court judge, whose familiarity with the relevant Indiana statutes greatly exceeds ours. We will therefore continue our stay of that portion of the order which requires the transfer of students into the Speedway and Beech Grove schools and remand the case with instructions to the district court to include them in the final order only on a finding that either the Uni-Gov or the HACI violations affected their districts.
 
 
 70
 To summarize the decision thus far, we find two grounds of support for the remedy ordered by the district court. The first is the state's affirmative decision, made for a discriminatory purpose, to limit the boundaries of IPS to the old city limits of Indianapolis. The second is HACI's decision, again for discriminatory purposes, to locate all public housing within IPS territory. We hold, however, that the Indiana student transfer statute does not provide an independent basis of support for the interdistrict remedy. The specific reassignment plan ordered by the district court judge is generally found not to be an abuse of discretion, although modification may be in order and although the School Town of Speedway and the School City of Beech Grove are, at least for the time being, removed from the scope of that order. We will now consider the various other issues presented on appeal.
 
 II
 COST OF ANCILLARY PROGRAMS
 
 71
 The state of Indiana appeals from the order of the district court requiring it to pay for certain ancillary relief (in-service training programs, etc.) ordered by the court. The Supreme Court has considered similar objections raised by a state in another case and expressly rejected them. Milliken v. Bradley (II), 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). We affirm the district court's holding in this regard.
 
 INTRADISTRICT RELIEF
 
 72
 In April of 1978 the district court denied a request by IPS to adopt an intradistrict plan pending resolution of the question of interdistrict relief. The United States, which was supporting the IPS proposal, appealed. We vacated the April order and ordered further consideration of the IPS proposal. On June 2, 1978, after a hearing, the district court again denied the IPS request. Both IPS and the United States appealed. In July we ordered the district court to allow IPS to implement the high school (phase I) portion of the plan. The rest of the appeal was retained. We now consider whether it was an abuse of discretion for the district court to reject the IPS plan for interim intradistrict relief for upper (phase II) and lower (phase III) elementary schools within the district. There is no question that desegregation of students within IPS is long overdue. The district court judge's fear that an interim plan of desegregation would legally preclude eventual interdistrict desegregation is groundless. His concern that a plan limited to IPS would lead to white flight is, as we have stated before, irrelevant. 503 F.2d 68, 80. Nevertheless, there also appeared to be valid reasons for the court's reluctance to approve the specific plan set forth by IPS: the lower elementary school plan was only a very sketchy outline of a hurriedly-adopted proposal and the upper elementary plan required two new buildings as well as remodeling of present facilities. Under these circumstances the court's refusal to adopt the phase II and phase III plans was not an abuse of discretion.
 
 
 73
 We are informed that more specific revised plans have now been submitted to the district court. It goes without saying that an intradistrict plan must be put into effect along with the interdistrict plan we approve today. In addition, we can think of no reason why an intradistrict plan should not be implemented in September 1980 regardless of the status of the interdistrict remedy at that time. The district court judge is instructed to give priority to the development of such a plan.
 
 THE INJUNCTION AGAINST HACI
 
 74
 In Part I we affirm the trial court's finding that HACI acted with a discriminatory purpose when it decided to locate all public housing projects within the old city of Indianapolis. The injunction against HACI, preventing it from building any low-rent housing within IPS, rests on the same evidence and is not otherwise contested. For the reasons already discussed, we affirm the injunction.
 
 III
 
 75
 The judgments entered against the School City of Beech Grove and the School Town of Speedway are vacated and remanded for further consideration in accordance with this opinion. In all other respects the judgments appealed from are affirmed.
 
 
 76
 TONE, Circuit Judge, dissenting.
 
 
 77
 For nearly half of the twenty-six years since Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Indianapolis School case has been in the federal courts.[1] It will soon be nine years since the district court found de jure segregation in the Indianapolis Public School System. We affirmed that judgment, and almost seven years ago the Supreme Court denied certiorari.[2] I join in the majority's statement that "we can think of no reason why an intradistrict plan should not be implemented in September 1980 regardless of the status of the interdistrict remedy at that time," and in the directive to the district court to "give priority to the development of such a plan." Ante at 1117. In this second decade of the litigation, the results of de jure segregation in the Indianapolis Public School System should not continue to remain in substantial part unremedied.
 
 
 78
 Looking back, the long delay, during which a generation of children has passed through segregated schools in Indianapolis, seems to me to be the fruit of a search for an elusive constitutional violation capable of supporting an interdistrict remedy that, the district court has often said, promises desegregation in fact as well as in law. Anyone familiar with the history of this case knows the determination with which the district court has pursued that goal. The court has said time and again that a remedy confined to the "IPS strait jacket" will produce a student population in excess of forty percent black, will in all probability exceed an indefinable "tipping point," will thus cause accelerating and irreversible "white flight" from IPS, and will, finally, produce nothing of lasting value for a city still in search of its first unitary school system. All this may be correct, cf. Milliken v. Bradley, 418 U.S. 717, 732-35, 739, 94 S.Ct. 3112, 3121-22, 3124, 41 L.Ed.2d 1069 (1974), but, as the district court once recognized, the federal courts may impose an interdistrict remedy only "if this can be done within the law."[3] The long effort to prove that it can in Indianapolis seems to me to have failed.
 
 
 79
 When we last remanded this case to the district court, we did so in pursuance of the Supreme Court's mandate that the case be reconsidered in light of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[4] Those then recent decisions make it clear that state action taken without discriminatory purpose does not violate the equal protection clause. On remand, the district court held no further evidentiary hearing on the issue of discriminatory purpose; it discovered the requisite purpose on the existing record, which a majority of this court apparently had considered insufficient.[5] Today we affirm on the basis of that record.
 
 
 80
 The record no more supports today than it did four years ago the thesis that either the passage of Uni-Gov or the actions of the Housing Authority were tainted by discriminatory purpose. I have stated in prior dissents[6] the reasons that led me then to conclude that invidious purpose had not been proved; a third look at the increasingly familiar transcript of the 1975 trial does not persuade me otherwise.[7] Without repeating, I hope, too much of what I earlier said, I feel compelled to add what follows.
 
 The Applicable Law
 
 81
 "(T)he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." Washington v. Davis, supra, 426 U.S. at 240, 96 S.Ct. at 2048. Though discriminatory purpose need not be the "dominant" or the "primary" motive force of the official act in question, Village of Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 265, 97 S.Ct. at 563, the concept "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Administrator v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted). "(D)isparate impact and foreseeable consequences, without more, do not establish a constitutional violation." Columbus Board of Education v. Penick, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979); see Dayton Board of Education v. Brinkman, 443 U.S. 526, 536 n.9, 99 S.Ct. 2971, 2978 n.9, 61 L.Ed.2d 720 (1979) (Dayton II ).[8]
 
 
 82
 The burden of proving discriminatory purpose is, initially, on the plaintiff. Village of Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 270, 97 S.Ct. at 566; Washington v. Davis, supra, 426 U.S. at 241, 96 S.Ct. at 2048. "Proof that the (state) decision . . . was motivated in part by a racially discriminatory purpose . . . shift(s) to the (state) the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. at 270 n.21, 97 S.Ct. at 566 n.21.
 
 
 83
 In determining the presence of discriminatory purpose, the following factors are relevant, though not exhaustive:
 
 
 84
 The historical background of the decision . . ., particularly if it reveals a series of official actions taken for invidious purposes.
 
 
 85
 The specific sequence of events leading up to the challenged decision . . .
 
 
 86
 Departures from the normal procedural sequence
 
 
 87
 Substantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
 
 
 88
 The legislative or administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action . . . .
 
 
 89
 Id. at 267-68, 97 S.Ct. at 564-565.
 
 Uni-Gov
 
 90
 The district court found no procedural irregularities in the passage of Uni-Gov. Indianapolis V, 456 F.Supp. at 188. So far as I can determine, the court found nothing in the "historical background of the decision" to adopt Uni-Gov[9] indicating "a series of official actions taken for invidious purposes." The "specific sequence of events" that led to Uni-Gov seems blameless.[10] The legislative history of the Act indicates that no discriminatory purpose was at work.[11] Of the five factors spelled out in Arlington Heights, the district court found one, "substantive departures," dispositive of the issue. Even here, the court did not inquire, as Arlington Heights directs, 429 U.S. at 267-68, 97 S.Ct. at 564-565, whether the "factors usually considered important by the decisionmaker strongly favor(ed) a decision contrary to the one reached." It is apparent that they did not.[12] Nor did the district court parse burdens of proof.[13] No finding was made that appellants had failed to rebut what the court apparently found to be a prima facie case of discriminatory intent. As Arlington Heights makes plain, however, a finding of invidious purpose is rebuttable by a showing that the state action in question would have been taken in the absence of such purpose; the rejection of a county-wide school system a few years prior to the passage of Uni-Gov is powerful evidence that the same race-neutral reasons that dictated this prior decision would, even assuming a hypothetical discriminatory purpose in the exclusion of schools from Uni-Gov, have produced the same result a few years later.[14] But putting aside these fine points of equal protection analysis, even the finding of a "substantive departure" is clearly in error.
 
 
 91
 The district court found that the Indiana General Assembly passed Uni-Gov with discriminatory purpose because it "departed" from a "long established rule that the school city of Indianapolis should expand with the civil city" when it "repeal(ed) the crucial section of the 1961 Act" and "eliminat(ed) the schools from Uni-Gov."[15] The majority, in sustaining this finding, is more circumspect. It notes that this "crucial section," had it been left unrepealed, would have expanded IPS boundaries only "if" Uni-Gov "could be characterized as an extension of Indianapolis' civil city boundaries by civil annexation." Ante at 1107. The majority appears to conclude that it can be so characterized. It seems to me plain that it cannot.
 
 
 92
 Under either the pre-1969 or the post-1969 civil annexation statute of Indiana,[16] civil annexation could be accomplished only by act of a city or town council. People who opposed annexation could file remonstrances. People who wished their property to be annexed could petition the council. No annexation could involve territory already a part of another city or town. The sole means for union of cities or towns was by a referendum in which citizens of the municipalities involved approved a proposed consolidation agreement reached by the councils. Union could be achieved only if all of the territory of both municipalities were to be joined.
 
 
 93
 In sharp contrast, Uni-Gov was the Act of the Indiana General Assembly. It was not the result of a petition, a referendum, or an act of a municipal council. It was not subject to remonstrances or to any of the other provisions of the civil annexation statutes;[17] indeed, it was the very need to get away from those unsatisfactory provisions that prompted the adoption of Uni-Gov.[18] To say that Uni-Gov, a complex reorganization of Marion County municipal governments undertaken by the State of Indiana, might be characterized as a civil annexation ignores very basic legal distinctions.
 
 
 94
 Because Uni-Gov did not involve an annexation, the repeal of § 9 of the 1961 Act is irrelevant to this case.[19] Had the section remained in force it would not have expanded the boundaries of IPS by an inch. Uni-Gov was totally beyond its terms.[20]
 
 
 95
 This crucial-section issue aside, all that remains of the substantive-departure finding is the related notion that Uni-Gov was a departure from a "long established rule" that IPS and Indianapolis would share a common boundary. This notion appears to stem from a belief that Indiana has had a policy favoring coterminous boundaries of city and school corporations. "Of greater relevance," the majority says, ante at 1106, "is the history of school district expansion and consolidation in Indiana." It continues: "Indiana has for generations pursued a legislative policy that school district lines should grow as the corporate lines of their cities grow." With all due respect, I simply do not think the law of Indiana supports this view. Regard for the reader's patience, as well as a desire to speed this case on its way, limits me to a brief summary of the history of Indiana law on this point.
 
 
 96
 The organization of schools in Indiana has gone through three basic phases. In the first phase, schools were organized by congressional township. The Territory, and later State, of Indiana were divided into townships of thirty-six square miles each; a thirty-sixth part of each township was reserved for the support of public schools. From a 1785 ordinance of the Continental Congress, through Indiana's first constitution in 1816, to a series of laws culminating in 1843, the method of organizing and supporting schools by township land grant was preserved.[21] During this time, school districts were "laid off in such manner as shall be most convenient for the population and neighborhoods."[22] School trustees could, "if convenience require(d) it," form districts "out of parts of each township," and a majority of the voters of a district could, by petition, alter the district boundaries "as convenience may require."[23]
 
 
 97
 The second phase began with the adoption of a new Indiana Constitution in 1851.[24] Under statutes passed pursuant to the new constitution,[25] the state took over the burden of financing the schools, and it reorganized them with the civil city or town as a basic geographical unit. Coterminous city and school boundaries were often the result.
 
 
 98
 The advent of the third phase was gradual. Some cities failed to reorganize the schools under the new laws, and these omissions were legalized by the legislature in 1897.[26] In 1899, cities that had reorganized their schools were permitted to revert to the township format, again by act of the legislature.[27] In 1901, cities were permitted to consolidate their schools with those of other school corporations in the same township.[28] Acts in the early part of this century permitted jointly run schools and consolidation of school corporations.[29] By mid-century, the third phase of Indiana school organization was well underway.
 
 
 99
 The new phase was ushered in by the need to increase the revenue base for the many small city school corporations. In 1947 and 1949, the Indiana General Assembly adopted statutes allowing the creation of school corporations without respect to city, town, or township boundaries.[30] By 1959 the Supreme Court of Indiana was to say:
 
 
 100
 (T)he legislature has found it necessary to enlarge the tax base supporting the local school unit. This has necessitated getting away from the identification of school district boundaries with the boundaries of civil units, and the many attempts of the General Assembly to deal with school consolidation in the past 40 years are but expressions of the legislative intent in this direction.
 
 
 101
 Fort Wayne Community Schools v. State, 240 Ind. 57, 64, 159 N.E.2d 708, 711 (1959). In 1959 also the legislature passed the School Corporation Reorganization Act[31] to accomplish that end.
 
 
 102
 Thus the policy from which Uni-Gov is said to be a substantive departure was first pursued for fiscal and administrative reasons, was abandoned when those reasons no longer supported it, and had not existed in Indiana for many years prior to the passage of Uni-Gov.[32] The only real policy that can be inferred from the foregoing history of school district boundaries in Indiana is that district lines should be drawn on a financially sound, efficient, and locally acceptable basis.
 
 
 103
 The 1961 Act so much debated in this litigation, § 9 of which is shown above to have been inapplicable to Uni-Gov because triggered only by civil annexation, is not inconsistent with the policy just described. Indeed, as the provisions summarized in the margin demonstrate, that Act is expressive of this policy and not of an obsession that school district and municipal boundaries must match, come what may.[33]
 
 
 104
 Given the absence of a substantive departure and the irrelevance of the repeal of § 9 of the 1961 Act, the court is left where it started: The legislature omitted schools from Uni-Gov, but there is no evidence that race was a reason for doing so. The real question then is whether the Indiana General Assembly had an obligation to include schools in the reorganization effort and thereby further remedial steps toward integration. As I understand Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), such an obligation did not exist in the absence of an interdistrict violation.
 
 Actions of the Housing Authority
 
 105
 To find discriminatory purpose in the Housing Authority's location of public housing within the City of Indianapolis is to ignore reality and the record in this case. In the first place, the record shows that the Housing Authority played a relatively small role in the selection of public housing sites. Two methods were used to select the sites. The first was the "turn-key" method.[34] As was testified at trial, by this method a private developer could "select sites and option the ground and subsequently turn the project over to the Housing Authority," after having built the units "consistent with specifications." A majority of the sites on which the projects were eventually built were selected by this method, which had the virtue of producing public housing faster than did site selection by government agency.
 
 
 106
 The remaining sites that were eventually used by the Housing Authority were found by a mayoral task force working in conjunction with the Metropolitan Planning Commission. The task force produced a map of potential housing sites "both inside and outside the city limit," and then recommended certain of these sites "to the administration in the Public Housing Authority as potential public housing sites." The task force also approved sites that private developers had optioned under the turn-key method.
 
 
 107
 From the foregoing it is apparent that the role of the Housing Authority in site selection was limited; the Authority apparently chose from among the sites tendered to it by the task force. Nothing in the record indicates how this choice was made, and there is no evidence concerning whether the Authority ever undertook any independent search for project sites. This alone undercuts the conclusion that plaintiffs proved discriminatory purpose on the part of the Housing Authority. If more were needed, it is clear from the record that the absence of sites outside of Indianapolis was due not to discriminatory purpose, but to neutral requirements of Indiana and federal law.
 
 
 108
 First, as we previously have acknowledged,[35] and as the majority does not now appear to dispute, the Housing Authority could obtain the necessary federal funds to finance its projects[36] only if it had obtained a cooperation agreement with "the governing body of the locality involved."[37] Under federal law, a cooperation agreement requires a governing body to provide services and to waive taxes on the project.[38] Second, the Housing Authority's jurisdiction under Indiana law during the time in question extended to Indianapolis and any area within five miles of the boundary of Indianapolis, but not to any territory within any other city.[39] Finally, any power the Authority may have had to build projects in the unincorporated suburbs was effectively nullified by the fact that it had no cooperation agreement with the "governing body" of those areas, which consisted of the Marion County Council and its executive arm, the Board of County Commissioners.[40]
 
 
 109
 The majority appears to approve a finding of invidious purpose because "(t)he evidence at trial . . . disclosed no serious attempts by HACI to obtain . . . cooperation agreements,"[41] and because "(the evidence at trial) showed that HACI never considered placing traditional public housing outside the old city limits." Ante at 1111. Apart from the vagueness of the phrases serious attempts and traditional public housing,[42] this view seems to me to have a number of problems. First, as I have earlier observed, the evidence at trial does not indicate whether or not the Housing Authority acted independently of the task force in seeking sites outside Indianapolis. The task force considered suburban sites and reported to the Housing Authority,[43] and for all the record reveals, the Authority may also have investigated suburban sites. Second, the majority's view places the burden of proof on the issue of discriminatory purpose on the wrong party. Even assuming that the Housing Authority failed to demonstrate a "serious" attempt to affirmatively facilitate school desegregation by placing projects in the suburbs, that fact scarcely suffices to carry plaintiffs' burden on the issue of discriminatory purpose. See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 270 & n.21, 97 S.Ct. at 566 n.21; Washington v. Davis, supra, 426 U.S. at 241, 96 S.Ct. at 2048. Finally, the record reveals that the task force that selected sites for the Housing Authority approached the County Council and County Commissioners about the possibility of placing projects in their jurisdiction. The response was negative; the reason given was that the County could not provide for the projects the municipal services then required under federal law.[44] I assume the Housing Authority was not required by the Fourteenth Amendment to engage in a futile repetition of the request. There is no evidence that the county government denied the request for invidious reasons. Thus, even if a violation might be predicated on that theory, cf. James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), there is no proof to support the theory.
 
 
 110
 As a practical matter, the Housing Authority had power to locate projects only within the City of Indianapolis. Such power as it had was exercised to promote integration, not segregation. The projects, most of whose occupants would be black, were located in what were at the time primarily white areas.[45] It is ironic that these sitings have now subjected the Housing Authority to a finding of invidious purpose.
 
 
 111
 If I am right in my belief that the record does not support the findings of discriminatory purpose,[46] the real issue raised by this case is whether otherwise permissible state action that does not attempt to remedy the effect of de facto segregation is for that reason alone an act of de jure segregation. The lesson to be derived from today's decision seems to be that the answer is yes, and that a state's attempt to solve a governmental or social problem will be constitutionally permissible only if the state adopts the solution that will maximize desegregation of schools that are de facto segregated. Indiana, had it chosen to leave Marion County's civil government in its chaotic state, instead of adopting Uni-Gov, would have had no affirmative obligation to reorganize the schools or to transfer students across district lines.[47] Similarly, had Indiana failed to provide a Housing Authority, or had it confined the Authority's jurisdiction to Indianapolis, the Constitution would not have been violated. Instead, Indiana acted to improve municipal government and to provide decent housing for persons of limited means in a manner that would promote integration in housing. Because Indiana did not include in its governmental-structure and housing reforms a program of affirmative action with respect to de facto school segregation, which if included would have made the reforms themselves impossible to carry out,[48] Indiana has been found to have intended a school segregation it did not create.
 
 
 112
 Thus a state may not restructure civil government or build public housing in an area in which de facto school segregation exists without assuming also the affirmative duty to remedy that segregation. The failure of the state action to include a remedy for school segregation will be enough to establish discriminatory purpose, for if the additional circumstantial indicia in this case can tip the scales toward a finding of invidious purpose, it is hard to imagine a case in which sufficient additional indicia would be lacking. The result of such a rule may be to force the elimination of some de facto segregation. Democratic processes being what they are, however, the result may also be the abandonment of efforts to provide needed governmental reforms and services. But whatever the result, today's decision cannot, I think, be reconciled with the distinction between de jure and de facto segregation as it has been recognized by the Supreme Court.[49]
 
 
 113
 With all respect for my colleagues, both here and on the district court, I can find no basis in the present record for expanding the remedy in this case beyond the system in which the violation occurred. I would therefore reverse the judgment and remand with the direction to proceed at once toward implementation of an intradistrict remedy.
 
 
 
 [1]
 Since this is the tenth opinion to be published in this case only the briefest summary of the facts of the case and its history is attempted here. Fuller descriptions may be found at 573 F.2d 400 (7th Cir. 1978); 503 F.2d 68 (7th Cir. 1974); and 332 F.Supp. 655 (S.D.Ind.1971)
 
 
 [2]
 368 F.Supp. 1191 (S.D.Ind.1973)
 
 
 [3]
 503 F.2d 68 (7th Cir. 1974)
 
 
 [4]
 541 F.2d 1211 (7th Cir. 1976)
 
 
 [5]
 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977)
 
 
 [6]
 573 F.2d 400 (7th. Cir.) cert. denied, 439 U.S. 824, 97 S.Ct. 802, 50 L.Ed.2d 786 (1978)
 
 
 [7]
 I.C. 1971, 20-8.1-6.5-1, et seq
 
 
 [8]
 These examples are taken from district court opinions published at 332 F.Supp. 655 (1971) and 368 F.Supp. 1191 (1973)
 
 
 [9]
 See 573 F.2d 400, 405-07 (7th Cir. 1978) and 541 F.2d 1211, 1217-18, 1221-22 (7th Cir. 1976) vacated and remanded on other grounds, 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977)
 
 
 [10]
 Carson v. State to Use of Town of Hanover, 1867, 27 Ind. 465, and cases cited in 332 F.Supp. 655, 675, n.86
 
 
 [11]
 Indiana Acts 1931, Ch. 94 § 1
 
 
 [12]
 Indiana Act 1959, Ch. 202 (School Reorganization Act)
 
 
 [13]
 Indiana Act 1961, Ch. 186 (School Annexation Statute). The Act applied only to school corporations "located in whole or in part in a county containing a civil city of the first class." Since Indianapolis is the only first class city in Indiana, the Act applied only to Marion County. Section 9 of the Act provided for a presumptive expansion of school district boundaries whenever a "civil annexation" occurred. In fact, section 9 applied only to the school districts of Indianapolis, Speedway, and Beech Grove
 
 
 [14]
 The district court also received and considered other evidence presented on the question of racial motivation, including the statements of a black state legislator who testified that race was never considered in drafting the legislation at issue here. That testimony was properly considered by the district court judge but does not compel a result contrary to the one reached
 
 
 [15]
 IPS argues that the district court erred in not making the findings suggested by this court and urges us to find from our own review of the record a significant present impact on residential housing segregation caused by intentionally discriminatory state actions. The record is far from clear, however, and we assume that the district court judge understood our instructions when he decided to limit his discussion of housing issues to the placement of public housing. We note that many of the blatantly discriminatory housing practices described in 332 F.Supp. 655, 662-663 were private acts, e.g., refusals by real estate brokers to show homes in white neighborhoods to blacks, newspaper advertising that described certain homes as "for colored," and the harassment, sometimes violent, of blacks who did manage to purchase homes in white neighborhoods
 
 
 [16]
 The eleventh project is the Lockfield Gardens project, built in 1936, for blacks, by the U.S. Public Housing Administration. The management of that project (which is now closed by order of the district court) was assumed by HACI in 1964
 
 
 [17]
 Judge Tone notes in the dissent that in the outlying areas of old Indianapolis, where most of these projects were built, existing housing was occupied predominately by white families. The district court, however, specifically denied the 1971 request by the government to find that the placement of housing in those areas tended to promote integration. 332 F.Supp. 655, 674, n.81. (S.D. Ind. 1971). In any event, for the purpose of this appeal, the critical finding by the district court is the one quoted above, the finding of "(an) invidious purpose to keep blacks within pre-Uni-Gov Indianapolis and IPS, and to keep the territory of the added suburban defendants segregated for the use of whites only."
 
 
 [18]
 See 332 F.Supp. 655, 674 (1971)
 
 
 [19]
 United States Housing Act of 1937, as amended, c. 338. Title III § 301, 63 Stat. 422 (1949)
 
 
 [20]
 Technically this evidence was received solely on the question of what sort of interdistrict remedy might be appropriate in this case: i.e., in the "remedy" rather than the "liability" phase of the proceedings below. In a discussion of a school desegregation plan that crosses district lines, however, the line between liability and remedy is not always distinct and since the evidence, if accepted might support the district court's decision to impose a city-wide desegregation order, it is being discussed at this point in our opinion
 
 
 [21]
 456 F.Supp. at 191
 
 
 [22]
 368 F.Supp. 1191, 1205 (1973)
 
 
 [23]
 We are mindful of the contentions of the school districts of Speedway and Beech Grove that they were not affected by the exclusion of schools from the Uni-Gov legislation and that therefore their inclusion in the interdistrict remedy ordered by the court was inappropriate. We will discuss their situation at a later point in the opinion
 
 
 [24]
 Although it is appropriate to discuss the Dayton II and Columbus cases in light of our earlier discussion of Dayton I, we do not rest our decision on either case. Both dealt with single school districts only and it is not necessary that we attempt to extend their discussions of affirmative duties to desegregate or burdens of proof to this multi-district situation
 
 
 [25]
 We also note that the Uni-Gov legislation, while to a large extent preserving the separate identities of Speedway and Beech Grove, did modify the absolute bar to unilateral annexation which had previously existed. IC 1971 18-4-15-1
 
 
 [1]
 The case was filed on May 31, 1968. Its progress may be charted as follows: United States v. Board of School Comm'rs of Indianapolis, 332 F.Supp. 655 (S.D. Ind. 1971) (Indianapolis I ), aff'd, 474 F.2d 81 (7th Cir.), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); United States v. Board of School Comm'rs of Indianapolis, 368 F.Supp. 1191 (S.D. Ind.) (Indianapolis II ), supp. mem. of decision, 368 F.Supp. 1223 (S.D. Ind. 1973) (Indianapolis III ), aff'd in part, rev'd in part, and remanded, 503 F.2d 68 (7th Cir. 1974), cert. denied, 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86, on remand, 419 F.Supp. 180 (S.D. Ind. 1975) (Indianapolis IV ), aff'd, 541 F.2d 1211 (7th Cir. 1976), vacated and remanded, 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977), on remand, 573 F.2d 400 (7th Cir.), cert. denied, 439 U.S. 824, on remand, 456 F.Supp. 183 (S.D. Ind. 1978) (Indianapolis V ). This sequence excludes the many unpublished orders involved in the case
 
 
 [2]
 Indianapolis I, 332 F.Supp. 655 (S.D. Ind. 1971), aff'd 474 F.2d 81 (7th Cir.), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973)
 
 
 [3]
 Indianapolis II, 368 F.Supp. at 1199
 
 
 [4]
 Indianapolis IV, 573 F.2d 400 (on remand from 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977))
 
 
 [5]
 Indianapolis IV, 573 F.2d at 410-11 (Swygert J.); id. at 415 (Fairchild, C. J., concurring); id. (Tone J., dissenting); but cf. id. at 404 (Swygert, J.)
 
 
 [6]
 Indianapolis IV, 541 F.2d at 1224 (Tone, J., dissenting); Indianapolis IV, 573 F.2d at 415 (Tone, J., dissenting) (on remand from the Supreme Court)
 
 
 [7]
 The clearly erroneous standard is applicable to the district court's findings of discriminatory purpose. Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 454-55, 99 S.Ct. 2941, 2945, 61 L.Ed.2d 666 (1979); id. at 468, 99 S.Ct. at 2952 (Burger, C. J., concurring); id. at 469, 99 S.Ct. at 2983 (Stewart, J., concurring and dissenting); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 534-35 n.8, 99 S.Ct. 2971, 2977-78 n.8, 61 L.Ed.2d 720 (1979) (Dayton II ). But cf. Columbus Bd. of Educ. v. Penick, 443 U.S. at 490-92, 99 S.Ct. at 2953-54 (Rehnquist, J., dissenting). See also id. at 457 n.6, 99 S.Ct. at 2946 n.6 (opinion of the Court)
 I take the standard to mean here, as elsewhere, that district court findings must stand unless we can form a "definite and firm conviction," on the record, that they are in error. Fed.R.Civ.P. 52(a); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); Apolskis v. Concord Life Ins. Co., 445 F.2d 31, 34 (7th Cir. 1971). As the Dayton and Columbus cases make clear, school desegregation cases are not subject to a special "laissez-faire theory of appellate review," Dayton Bd. of Educ. v. Brinkman, supra, 443 U.S. at 543, 99 S.Ct. at 2982 (Rehnquist, J., dissenting). Moreover, our duty of deference with respect to facts found in the district court is qualified by our especially heavy duty, in a constitutional case, to make an "independent examination" of the record. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964). We must ascertain whether the evidence adduced supports the conclusion drawn under the controlling principles of law.
 The duty of both the District Court and the Court of Appeals, in a case such as this, . . . is to first determine whether there was any (state) action . . . which was intended to, and did in fact, discriminate against minority pupils . . . .
 Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (Dayton I ).
 
 
 [8]
 As the majority recognizes, this case does not involve the sort of stark pattern of disproportionate racial effect that may, without more, give rise to an inference of discriminatory purpose. See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 266, 97 S.Ct. at 563; see also Washington v. Davis, supra, 426 U.S. at 254, 96 S.Ct. at 2054 (Stevens, J., concurring)
 
 
 [9]
 The district court's discussion of historical background was, in the main, limited to a general survey of past discrimination in Indiana. It was not focused on the history "of the decision" to adopt Uni-Gov. Indianapolis V, 456 F.Supp. at 186-87. Quite apart from what appear to be serious questions concerning the record support for some of the district court's historical findings, the fact that Indiana, like most if not all other states in the Union, has a history of past acts of discrimination does not, in my view, lend much weight to the conclusion that the present generation of Indiana public officials, or the public they represent, has learned nothing from the lessons of the past
 
 
 [10]
 I can find nothing in the district court's consideration of the "specific sequence of events" leading to Uni-Gov that would support an inference of invidious purpose. See id. at 187. For example, although the district court found otherwise, Mayor Lugar's testimony indisputably contains numerous "educational or governmental" reasons for excluding schools from Uni-Gov. See notes 11 & 12 infra
 
 
 [11]
 State Representative Ray Crowe, who is black, served on the Indiana House Committee on the Affairs of Marion County in 1969, when Uni-Gov was debated by that committee. He testified at trial, in response to a question that asked if race had been a factor in excluding schools from Uni-Gov: "I am positive race did not enter into the discussions or reasons whatsoever." See also note 12 infra. Two members of the Metropolitan Planning Commission that participated in the development of the Uni-Gov proposal were also black
 Then Mayor, now Senator, Lugar testified at trial that his task force for the planning of Uni-Gov discussed the inclusion of schools only briefly and rejected the idea out of hand because, first, under the 1959 School Corporation Reorganization Act, see note 31 infra, officials had already thoroughly considered and rejected the idea of a county-wide school system, see notes 12 & 14 infra, and, second, the administration of schools had traditionally been handled separately from the administration of civil government. Lugar testified after having reviewed the minutes of the task force meetings. Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 268, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977).
 
 
 [12]
 As is clear from even a cursory study of the history of school district boundaries in Indiana, one factor of great importance has always been school financing. Mayor Lugar testified at trial that IPS opposed expansion of its boundaries because "it would be to the disadvantage of the Indianapolis Public School System if the tax base was county-wide." He further observed that, at the time reorganization of the school systems was considered, Indianapolis had already built its schools, but that the same was not true of the suburbs. Expansion would have caused city taxpayers to assume the burden of financing the construction of suburban schools and would thus have been "unfair." In 1967, the Board of School Commissioners of IPS adopted a resolution declaring that expansion of IPS throughout Marion County would serve neither the economic interests of IPS nor the educational interests of its students
 Representative Ray Crowe testified that the objection to inclusion of IPS in Uni-Gov "was that the schools have been recently reorganized and the school systems prefer to be independent and carry on with their school systems as they were at that time." Charles Whistler, one of the drafters of Uni-Gov, testified to the same effect. He further testified that inclusion of the schools in Uni-Gov might have impaired the value of their bonds. It appears that factors usually considered important, such as financing, local control, and administrative continuity, "strongly favored" the result reached in Uni-Gov, and not its opposite.
 It should be noted also that any inclusion of schools in Uni-Gov would have presented very complicated problems. Among other things, the statutory inclusion would have had to deal with the method of selecting a governing body; the rights of teachers serving under different collective bargaining agreements with different pay scales; the degree of local control to be accorded to suburban schools, if any; and an equitable apportionment of existing assets and liabilities of the various school corporations.
 
 
 [13]
 The district court apparently was of the view, in fact, that discriminatory effects alone, if foreseeable, are sufficient to shift to the state the burden of proof on the issue of purpose. Indianapolis V, 456 F.Supp. at 189 (citing Oliver v. Michigan State Bd. of Educ., 508 F.2d 178, 182 (6th Cir. 1974)). As the Supreme Court has since made clear, this view is incorrect. Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 536 n.9, 99 S.Ct. 2971, 2978 n.9 (1979)
 
 
 [14]
 See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 270 n.21, 97 S.Ct. 555, 566 n.21, 50 L.Ed.2d 450 (1977). As the majority observed in Indianapolis IV, 541 F.2d at 1217,
 The Marion County Reorganization Committee, appointed pursuant to the (School Corporation Reorganization) Act (of 1959), initially recommended that all school systems in the county be merged into one, but the unanimous opposition of the suburban school districts defeated the merger proposal. There is no evidence that this opposition was racially motivated.
 Ultimately, IPS, like the suburban districts, opposed consolidation. See note 12 supra. The following passage from the 1975 trial is also illuminating:
 The Court: I don't know. The defendants will tell us in due time what these exhibits all mean, but I at this moment I rather infer that the purpose of the exhibits is to prove or tend to prove that the present division of Marion County into eleven separate school districts is something that happened because of reasons pertaining primarily to school finances as well as to the desire of non-IPS schools to maintain local autonomy rather than for reasons of separating students based on race. I presume that is the point of these exhibits.
 I presume that if the Government or the intervening plaintiffs had some evidence to the contrary that they would be cross-examining, or examining along those lines.
 Now I have said at one point in these proceedings that it may not make a difference what the motive was, the only question would be what was the result . . . .
 The record contains nothing to indicate that the normal desire for local financing and control of the school districts, see note 12 supra, was not the prime reason for the failure of the county-wide school district proposal. Thus, the desire for autonomous local schools would, so far as the record reveals, have blocked any county-wide consolidation of the schools either in Uni-Gov or elsewhere. There is nothing sinister about this:
 No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.
 Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 3125-3126, 41 L.Ed.2d 1069 (1974).
 
 
 [15]
 Indianapolis V, 456 F.Supp. at 188. The schools were never "eliminated" from Uni-Gov. As Mayor Lugar testified at trial, no draft of the proposed legislation ever included the schools
 The "crucial section" was § 9 of Indiana Acts 1961, Ch. 186. It provided, in pertinent part,
 (a) Whenever the boundaries of any civil city are extended by a civil annexation which becomes effective as of a date subsequent to the effective date of this act, the boundaries of the school city which has jurisdiction over the area of such civil city or the major portion thereof shall be correspondingly extended by virtue of such civil annexation, subject only to the further provisions of this Section.
 Section 9(b) gave a right of remonstrance to the losing school corporation. Further provisions of the Act are summarized in note 33 infra. Section 9 was repealed by Indiana Acts 1969, Ch. 52, § 2 (codified as Ind.Code § 20-3-14-11). This Act substituted a provision which allowed alteration of school boundaries only through a modified school annexation procedure.
 
 
 [16]
 Indiana Acts 1905, Ch. 129, §§ 241-244 (as amended by Indiana Acts 1955, Ch. 269) (repealed); Indiana Acts 1969, Ch. 239, §§ 301 & 401-414 (codified as Ind.Code §§ 18-5-10-8 & -19 to -32)
 
 
 [17]
 For example, unlike the Indiana civil annexation procedure for effecting a union between two towns or cities, see Indiana Acts 1905, Ch. 129, § 241 (repealed); Indiana Acts 1969, Ch. 239, § 301 (codified as Ind.Code § 18-5-10-8), Uni-Gov provided for a limited merger of Indianapolis and other cities and towns in Marion County without a consolidation agreement or a referendum. See Indiana Acts 1969, Ch. 173, §§ 102(e) & 406 (codified as Ind.Code §§ 18-4-1-2 & 18-4-4-6). Similarly, the resulting consolidated city did not possess powers that were uniformly applicable to all territory within its borders; civil annexation or union of cities and towns could not have produced this result. Compare Indiana Acts 1905, Ch. 129, §§ 241, 242a & 244 (as amended by Indiana Acts 1955, Ch. 269, § 2) (repealed) and Indiana Acts 1969, Ch. 239, § 407(c) (codified as Ind.Code § 18-5-10-25(c)), with, e. g., Indiana Acts 1969, Ch. 173, §§ 234, 314 & 406 (codified as Ind.Code §§ 18-4-2-34, -3-14 & -4-6)
 
 
 [18]
 Civil annexation as a means of expanding Indianapolis boundaries had proved unsatisfactory for two reasons. First, because unilateral annexation by Indianapolis could not affect the territory of adjacent cities and towns. Speedway, Beech Grove, and Lawrence blocked Indianapolis expansion on the west, southeast, and northeast. The fifteen other municipalities in Marion County were also immune to unilateral civil annexation. Second, the remonstrance procedure gave property owners and residents the right to effectively block annexations by tying them up in lengthy litigation. This right was employed against virtually every attempt by Indianapolis at unilateral annexation, because, as city planner Vogelgesang testified, residents "resisted annexation and felt the city could not provide them with services for the additional tax money that they would be paying." Thus, Mayor Lugar stated the reasons that led him to pursue the idea of Uni-Gov as follows:
 (A)nnexation as it was then part of our law was simply not going to make any difference, . . . in each of these cases we were successfully blocked and it did not occur to me circumstances in which annexation by the civil city could be successfully pursued in any large manner. So, as a result, I was intrigued by (the idea of Uni-Gov) . . . .
 He further stated: "(T)he Uni-Gov concept was not a concept of annexation. It was essentially a concept of governmental reorganization which left the whole annexation question really totally to the side." Thus Charles Whistler, one of a group of attorneys who drafted Uni-Gov, testified at trial that civil annexation statutes had no application to Uni-Gov. No different conclusion can result from the provision of Indiana Acts 1961, Ch. 186, § 1(e), which defined "civil annexation" as "any action" extending the boundaries of a civil city. The remainder of the 1961 Act makes plain that the annexation meant was that previously defined by statute. E. g., id. § 9(b): "Whenever . . . a civil city shall adopt an ordinance effecting such a civil annexation as is described in Section 9(a) of this act, the losing school corporation shall have the right" to remonstrate under the provisions of Indiana Acts 1905, Ch. 129, § 243 (as amended), the then applicable civil annexation statute.
 
 
 [19]
 The majority attempts to draw an inference of discriminatory purpose from the fact that the repeal of § 9 passed as a "special bill, just sixteen days before final passage of the Uni-Gov legislation." Ante at 1107. Even if § 9 had had any potential application to Uni-Gov, which it plainly did not, the time of passage of the repealer bill should not be considered in isolation from the history of the bill. The majority has overlooked the fact that the repeal was first proposed in 1967, and indeed was passed by both houses of the Indiana legislature in that year but failed to become law because vetoed by the predecessor in office of the Governor who ultimately signed the repeal. The former Governor's 1967 veto message said that the bill might contain a possibility of partisan political mischief. As Mayor Lugar testified: "In '67 Uni-Gov was not being thought of." Moreover, as is demonstrated in note 18, supra, there were virtually no civil city annexations for IPS to follow for many years before 1969 because the difficulties described in note 18, supra, made them impracticable; this failure of the annexation mechanism was, as Mayor Lugar testified, the major reason for the passage of Uni-Gov. The failure of civil annexation was surely also a prime reason for the repeal of § 9 and other civil annexation provisions in 1969. All this, as well as the inapplicability to Uni-Gov of a statute dealing with civil annexation, see text supra, is ignored in the majority's conclusion, ante at 1107, that "the repeal of section 9 of the 1961 Act appears to have been done in direct response to concerns that otherwise the boundaries of IPS would expand with the borders of the new City of Indianapolis." The record contains no evidence that such concerns existed and no basis for inferring their existence from other facts
 
 
 [20]
 Uni-Gov was beyond the terms of the 1961 Act, and thus unaffected by the 1969 repealer of § 9 of that Act, for yet another reason: Uni-Gov itself explicitly excluded schools from the reorganization plan, Indiana Acts 1969, Ch. 173, § 314 (codified as Ind.Code § 18-4-3-14); there was thus no need to attempt to exclude the schools by another enactment. Nor was the exclusion of schools from Uni-Gov remarkable. The Health and Hospital Corporation was excluded, as were the county offices of auditor, recorder, treasurer, sheriff, coroner, surveyor, clerk of the circuit court, and assessor. Police and fire protection were organized into "special service" districts which expanded beyond Indianapolis only in accordance with defined procedures; these districts apparently have expanded little since 1970. The "excluded cities" of Speedway, Beech Grove, Lawrence, and Southport retained control over aspects of local government such as police, fire, and sanitary services. The following agencies were also wholly or partly excluded: the airport authority and board; the county department of welfare and board; the county home board; the building authority, board of trustees and board of directors; the capital improvements board of managers; the housing authority; the library districts and boards; and "all other municipal corporations, boards, agencies and commissions" not expressly included in the Act. Id.; see also id. § 404 (codified as Ind.Code § 18-4-4-4). The reason for these exclusions, Mayor Lugar testified, was to limit Uni-Gov and thereby insure the passage of its needed organizational improvements. Lugar said his attitude at the time was that "so long as a reasonable structure that allows for a county executive and county legislature and a bare boned situation . . . gives us some possibility to amend our future, I would be willing to settle for that." He further noted that many compromises in the areas of fire, police, and administrative agencies had to be worked out before the intricate process of negotiations produced the accommodation that was Uni-Gov. See also note 12 supra
 
 
 [21]
 Ind.Const. art. IX, § 1 (1816) (superseded); Indiana Acts 1818, Ch. 49; Indiana Revised Laws 1824, Ch. 97; Indiana Revised Laws 1831, Ch. 86; Indiana Revised Statutes 1838, Ch. 94; Indiana Revised Statutes 1843, Ch. 15; H. Hawkins, Indiana's Road to Statehood, A Documentary Record 9-16 & 60-67 (Indiana Sesquicentennial Commission 1964)
 
 
 [22]
 Indiana Revised Statutes 1843, Ch. 15, § 32
 
 
 [23]
 Id. §§ 35 & 38
 
 
 [24]
 Ind.Const. art. 8, § 1 (1851)
 
 
 [25]
 Indiana Revised Statutes 1852, Ch. 98; Indiana Acts 1855; Ch. 86; Indiana Acts 1859, Ch. 119, § 1 (codified as Ind.Code 1971, § 20-2-8-1); Indiana Acts 1861, Ch. 41, § 4; Indiana Acts 1865, Ch. 1, § 4 (repealed by Indiana Acts 1972, P.L. No. 170, § 1)
 
 
 [26]
 Indiana Acts 1897, Ch. 72, § 1
 
 
 [27]
 Indiana Acts 1899, Ch. 160
 
 
 [28]
 Indiana Acts 1901, Ch. 200
 
 
 [29]
 Indiana Acts 1911, Chs. 187 & 193; Indiana Acts 1915, Ch. 141; Indiana Acts 1917, Chs. 19, 23 & 148; Indiana Acts 1919, Chs. 151, 216 & 229; Indiana Acts 1921, Ch. 268; Indiana Acts 1925, Ch. 134; Indiana Acts 1927, Chs. 58, 111 & 225; Indiana Acts 1937, Ch. 154
 
 
 [30]
 Indiana Acts 1947, Ch. 123 (codified as Ind.Code 1971, § 20-4-5) (as amended); Indiana Acts 1949, Ch. 226 (codified as Ind.Code 1971, § 20-4-8) (as amended)
 
 
 [31]
 Indiana Acts 1959, Ch. 202 (codified as Ind.Code 1971, § 20-4-1). The statute disregarded municipal, county, and township boundaries in its pursuit of "an efficient and economical reorganization plan best suited to local conditions." Id. § 1 (Ind.Code 1971, § 20-4-1-1). Under this statute, the present boundaries of school corporations in Marion County were set. I do not understand appellees to contend that there was anything unconstitutional about the process that fixed these boundaries. It is also noteworthy that the school reorganizations accomplished pursuant to the 1959 Act resulted in school boundaries not coterminous with other units of government in 70% of the school corporations in Indiana. Indianapolis IV, 541 F.2d at 1217
 
 
 [32]
 The majority observes, ante at 1107, that, "although there was seldom a perfect correspondence between civil city and school boundaries the exceptions were generally in favor of larger, rather than smaller, school districts." This appears to be a reference to the 1959 School Corporation Reorganization Act, which, as noted above, disregarded civil unit boundaries to achieve school corporations with a larger tax base. It seems to me possible, however, that the majority means by this comment to indicate that the failure to expand IPS boundaries was somehow inconsistent with a subsidiary "policy" favoring the larger over the small school corporation. As is plain, however, IPS had no need to expand to improve its tax base: IPS was, and apparently still is, the most fiscally secure school corporation in Marion County. Moreover, IPS is now the 29th largest school corporation in the nation, and Marion County contains no school corporation below the median size of Indiana's 305 school corporations. As there was no need after 1959 to enlarge the tax base of any of the Marion County school corporations, there was also no need to expand IPS boundaries to the county line
 The majority also appears to believe that the "policy" favoring coterminous boundaries was enforced "particularly in Marion County." Ante at 1108. I have, I hope, sufficiently demonstrated the absence of such a policy either in Marion County or elsewhere in Indiana. Moreover, neither the record nor the majority opinion suggests any rationale that could conceivably underlie a policy of coterminous boundaries with respect to only one county in Indiana.
 
 
 [33]
 The 1961 Act contemplated, by its very terms, that coterminous boundaries were not an inviolate policy. It speaks of school districts and cities that occupy "all or the major part in area" of one another. Indiana Acts 1961, Ch. 186, § 1(b) & (c); see also note 15 supra. Moreover, it allowed two school corporations to transfer territory between them by agreement regardless of civil boundaries, § 3, allowed IPS, as well as the School Cities of Speedway and Beech Grove, a conditional power of unilateral annexation of territory from an adjoining school corporation, § 4, and provided, in the case of a civil annexation, for agreement between the losing and the gaining school corporations to disregard for school purposes all or part of the alteration brought about by the civil annexation, § 9(c). Indeed, actions taken pursuant to the 1961 Act did in fact cause the separation of IPS and Indianapolis boundaries
 
 
 [34]
 Concerning the turn-key method, see 24 C.F.R. § 841.201 et seq. (1979)
 
 
 [35]
 Indianapolis IV, 541 F.2d at 1216
 
 
 [36]
 The Housing Authority depends on federal contributions and federal guarantees of its bonds. Neither Indiana nor any state agency underwrites the Authority's financing. Ind.Code § 18-7-11-14
 
 
 [37]
 The applicable provision at the time was 42 U.S.C. § 1415(7)(b)(i). 42 U.S.C. § 1437c(e) (1976) is the recodification of that provision and is identical in all relevant respects. It provides, in pertinent part,
 In recognition that there should be local determination of the need for low-income housing to meet needs not being adequately met by private enterprise
 (1) . . .
 (2) the Secretary shall not make any contract for loans . . . or for annual contributions pursuant to this chapter unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation required by the Secretary pursuant to this chapter.
 
 
 [38]
 Although a cooperation agreement requires the governing body to agree to waive real and personal property taxes on the project, the governing body can receive, in lieu thereof, up to ten percent of the rental income. 42 U.S.C. § 1437d(d) (1976); see also Mahaley v. Cuyahoga Metrop. Housing Auth., 355 F.Supp. 1245, 1248 (N.D.Ohio 1973). Besides the waiver of taxes, HUD regulations current in 1966 required that cooperation agreements contain a promise by the governing body to eliminate "unsafe and insanitary dwelling units" and to supply "public services," as well as "other forms of cooperation" to the projects. 24 C.F.R. § 1520.1(f) & .3 (1966). Deputy Mayor Carroll so testified at trial. See also James v. Valtierra, 402 U.S. 137, 143 n.4, 91 S.Ct. 1331, 1334 n.4, 28 L.Ed.2d 678 (1972):
 (T)he local government body must agree to provide all municipal services for the units and to waive all taxes on the property. The local services to be provided include schools, police, and fire protection, sewers, streets, drains, and lighting.
 The applicable regulations today are no different in this regard. 24 C.F.R. § 841.102(c) & .110(b) (1979); cf. id. § 200.710; see also notes 44 & 45 infra. Thus, without a cooperation agreement promising both a waiver of taxes and the provision of essential services, HUD would not finance the project and, as a consequence, see note 36 supra, the Housing Authority could not build it.
 
 
 [39]
 Indiana Acts 1937, Ch. 207, § 3(g). This provision was amended by Indiana Acts 1969, Ch. 291, § 3(g) (codified as Ind.Code § 18-7-11-3(g)), to provide that the Housing Authority had jurisdiction to build in a "city or town" within five miles of Indianapolis only if the city or town "consent(ed) thereto by resolution of its governing body."
 Whether or not the Housing Authority had jurisdiction, prior to 1969, to build in "towns," as distinguished from "cities," within five miles of the boundary of Indianapolis, federal law would have required the governing body of the town in question to enter into a cooperation agreement with the Authority, see note 37 supra. I know of nothing in the record to indicate whether any such agreement with a town was ever sought or denied. The record is also vague on which towns, other than perhaps the Town of Speedway, might have been within the Authority's pre-1969 jurisdiction, and whether any suitable sites existed in any such town during the time in question. The reason for this is that the plaintiffs have never pursued the theory that the failure to build in "towns" as opposed to "cities" or unincorporated areas of Marion County was the essence of the Housing Authority's allegedly wrongful conduct. Even assuming plaintiffs have preserved this precise issue, they have clearly failed to meet their burden of proving that the failure to locate projects in "towns" within five miles of Indianapolis was prompted by discriminatory purpose.
 
 
 [40]
 There is no question that, as to location of housing projects in the unincorporated areas of Marion County, the Board of County Commissioners and the Marion County Council together constituted the "governing body" involved. They were the body that would be required by federal law, see notes 37 & 38 supra, to sign a cooperation agreement and promise to provide essential services before federally funded housing could be located in their jurisdiction. See 24 C.F.R. § 1520.1(e) & .3 (1966); Ind.Code § 18-7-12-2
 The majority notes, ante at 1110, that "(o)ne project was built just across the street from Warren township (then 98% white). Another (the Eagle Creek project) was located on land that was once a part of Wayne township (then 99% white), but was annexed by the old city, at HACI's request." Aside from the fact that the integrative impact of the location of these projects scarcely evinces a segregative purpose, see note 45 infra, the inference of discriminatory purpose the majority would draw from these sitings is entirely undercut by the fact that the Housing Authority had no cooperation agreement with the governing body of either Warren or Wayne township; the Authority thus could not locate projects in these townships. This fact explains both the sitings and the annexation of one of the sites to Indianapolis.
 
 
 [41]
 In the majority opinion in Indianapolis IV, the fact that an effort was made to obtain cooperation agreements was recognized. 541 F.2d at 1216
 
 
 [42]
 I understand the reference to "traditional" public housing to mean housing developed by the Housing Authority and financed by HUD under the terms of the United States Housing Act of 1937, 42 U.S.C. § 1437 et seq. (formerly codified at 42 U.S.C. § 1401 et seq.) (as amended). Ten such projects were built in Indianapolis in the 1960's. The record contains many references to other types of housing, some of it built in the suburbs, and some of it apparently under the control of the Housing Authority. The location of these other types of housing is not alleged to have been discriminatory
 
 
 [43]
 Testimony at trial established that the task force, while acting on behalf of the Housing Authority, determined that sites outside of Indianapolis were not suitable both because of an absence of a cooperation agreement with the county government and because of an inability to secure from that body either a cooperation agreement or the municipal services that the agreement would have required the county to provide. See note 44 infra, and accompanying text. To say that the task force determined that suburban sites were not feasible is not to say, however, that suburban sites were not considered
 
 
 [44]
 Deputy Mayor Carroll, who served on the staff of the task force, testified:
 At that time we were attempting to select the locations for the Housing Authority sites, the county government, which was current before Uni-Gov at that time, operated by the County Council, County Commissioners, indicated in the process of early discussions with the committee that they were unable to provide the kinds of services that were required for public housing location at that time.
 An idea of the type of services that the County Council and County Commissioners were being asked to provide, see note 38 supra, can be gleaned from the following:
 September 1965 HUD Guidelines on Site Selection required that sites be "well related to public transportation, public schools, shopping" and all other essential services; they further required that consideration be given to the proximity of playgrounds, off-street parking, and the availability of sewer services. Id. § 205.1(3) & (4).
 City planner Vogelgesang testified at trial that the search for project sites in the suburbs was virtually precluded by a combination of jurisdictional and HUD guideline requirements. Deputy Mayor Carroll testified that the task force's site selection criteria included the availability of water, sewer, utility, police, fire, public transportation, school, park, shopping and other basic community services; that access to places of employment was considered; and that many of these criteria were incorporated into the then current HUD guidelines. Carroll further testified that a "substantial concentration" of services was required for public housing projects that "(t)hese did not exist in the unincorporated areas of the county," and that the public transportation and low cost health, legal, and welfare services that were necessary to the tenants of housing projects were not available in the suburbs. John Mullin, Assistant Director of the Housing Authority, testified that many public housing tenants do not own automobiles and that that fact makes access to public transportation essential for a public housing site. Public transportation was not available in the suburbs at the time in question. Seven years later, at the time of trial, many potential suburban sites were still without public transportation. Yet the county government was being asked to provide public transportation, as well as other services, before projects located in its jurisdiction could open.
 HUD regulations currently require that sites be served by utilities such as water, gas, and electricity, and that they have adequate sewer and street service. 24 C.F.R. § 841.107(b) (1979); see id. § 200.710. HUD's criteria for site approval includes, among other things, the presence of recreational, social, educational, commercial, and health services; the absence of flooding, air pollution, excessive noise, sewage hazards, septic tank backups, mudslides, smoke or dust, vibration, vehicular traffic, rodent or vermin infestation, and fire hazards; the cost and time involved in travel to places of employment "providing a range of jobs for low(er) income workers"; and general consistency with environmental, developmental, and social goals for the area in question. Id.; see also note 45 infra.
 
 
 [45]
 Testimony during the 1975 trial showed that in 1968 about thirty percent of the residents of projects were white, and that a majority of the ten projects were in nearly all-white neighborhoods when they were built. For example, the Eagle Creek project that was located on land annexed from Wayne township and was earlier mentioned in another regard, see note 40 supra, was located in an area 99.3% white in 1960 and 91.7% white in 1970. Moreover, HUD approval of projects has, at least since 1972, been in part contingent upon their being located in a fashion that will promote integration. 24 C.F.R. § 200.710 (1979). HUD approved the project sites on which the Housing Authority built, and even if integrative impact was not an explicit criterion at the time HUD gave its approval, it is difficult to believe that HUD would have approved locations that were selected to promote segregation. In addition, Housing Authority Assistant Director Mullin testified at trial that the Authority had attempted to maintain a racial balance within the projects themselves, but that HUD regulations requiring applications to be granted without regard to race had made it impossible to maintain a racial balance. Indeed, the Justice Department, though it takes a contrary view now, suggested in 1971 that the district court find that the "locations of six of the ten projects . . . have tended to promote integration." Indianapolis I, 332 F.Supp. 674 n.81. The majority notes, ante at 1110 n.17, that the trial court determined that the evidence was insufficient to support a finding of integrative effect. This determination was made before the evidence just chronicled had been heard. Moreover, it appears obvious that the location of the projects did produce integration in housing. The location did not, apparently, further school desegregation; but the Housing Authority's business was housing, not schools
 
 
 [46]
 Because of my view that discriminatory purpose has not been demonstrated, I do not consider here the difficult remedial problems that I believe are posed by this case
 
 
 [47]
 This is clear from Milliken v. Bradley, supra, and from our outright reversal in Indianapolis II, 503 F.2d 68, of the interdistrict remedy as to school districts outside Marion County
 
 
 [48]
 As the majority acknowledges, Uni-Gov would not have passed had the schools been included. Ante at 1107. As the record makes plain, the absence of necessary services and cooperation agreements precluded the location of housing projects in the suburbs
 
 
 [49]
 But cf. Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 489, 99 S.Ct. 2941, 2971, 61 L.Ed.2d 666 (1979) (Rehnquist, J., dissenting); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 542, 99 S.Ct. 2971, 2981, 61 L.Ed.2d 720 (1979) (Rehnquist, J., dissenting); id. at 2988-93 (Powell, J., dissenting)